United States District Court

Eastern District of Louisiana

Henderson

v.                                    CIVIL ACTION NO. 2:04-cv-01040 K(5)

Amer Home Prod Corp


The record reflects that a Notice of Removal has been filed in
the captioned case; accordingly,

Pursuant to 28 U.S.C. 1447(b), the removing party is directed
to file within 10 days:

(1) A list of all parties still remaining in this action;

(2) Copies of all pleadings, including answers, filed by
those parties in state court; and

(3) Copies of the return on service of process on those
parties filed in state court.

New Orleans, Louisiana, April 15, 2004.

By Direction of the Court

LORETTA G. WHYTE, CLERK



FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 APR 13  PM 4: 33

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ABERTHA HENDERSON                      *      CIVIL ACTION NO.
                                       *
                                       *      SECTION        04-1040
                                       *
                                       *      MAGISTRATE
VERSUS                                 *
                                       *                     SECT. K MAG. 5
AMERICAN HOME PRODUCTS,                *
CORPORATION; DAWNE STAGG;
AMY N. HOWE, ARTHUR H. MCGEHEE,*
JR.; CANDACE O. PATTEN; ROBERT         *
THOMAS; LEO A. ASCANI, JR.;            *
CHANTEL L. LEININGER; EMILE F.         *
MERCANTE, JR.; K. TODD MASSON;         *
ION LABORATORIES, INC.; SMITH-         *
KLINE BEECHAM CORPORATION;             *
MEDEVA PHARMACEUTICALS, INC.;          *
FISONS CORPORATION; GATE PHAR-         *
MACEUTICALS, A DIVISION OF             *
TEVA PHARMACEUTICALS, USA;             *
RUGBY LABORATORIES, INC.;              *
GENEVA PHARMACEUTICALS, INC.;          *
WYETH-AYERST PHARMACEUTICALS,*
INC., f/k/a; Wyeth-Ayerst Laboratories, Inc.,*
a division of American Home Products, Inc. *
WYETH LABORATORIES COMPANY;            *
INTERNEURON PHARMACEUTICALS,           *
INC.; A.H. ROBINS COMPANY, INC.;       *

477101.1

1

Fee_____150.

____ Process_____
_X_ Dktd._____
____ CtRmDep._____
____ Doc. No._____

EON LABS MANUFACTURING,                   *
INC.,  AND GEM DRUGS - RESERVE            *

## NOTICE OF REMOVAL

NOW INTO COURT, through undersigned counsel, come defendants, Wyeth, f/k/a

American Home Products Corporation, Wyeth Pharmaceuticals Inc. ("WPI") (improperly

designated in the Petition for Damages as Wyeth-Ayerst Pharmaceuticals, Inc.) and American

Home Products Subsidiary Holding Company (improperly designated in the Petition for

Damages as Wyeth Laboratories Company) (together, "Wyeth")[1] to submit this Notice of

Removal of the above-captioned case, on the following bases:

---

[1]  Defendant A.H. Robins Company, Inc. was merged into American Home Products Corporation ("AHPC") on August 3, 1998 and ceased to exist as a separate entity. On March 11, 2002, the name of American Home Products Corporation changed to Wyeth. Thus, Wyeth will remove on behalf of American Home Products Corporation. On January 1, 1999, Wyeth Laboratories, Inc. was merged into Ayerst Laboratories, Inc.  The surviving company was Ayerst Laboratories, Inc., the name of which was changed to Wyeth-Ayerst Pharmaceuticals, Inc. ("WAPI"). On March 22, 2002 the name of WAPI was changed to Wyeth Pharmaceuticals Inc.("WPI"). As a result, WPI will remove on behalf of  WAPI. On June 30, 2001, Wyeth-Ayerst Laboratories, Co. ("WALCO") (improperly designated in the Petition for Damages as "Wyeth Laboratories Company") was merged into AHPSHC and ceased to exist as a separate entity.  As a result, AHPSHC will remove on behalf of WALCO.
477101.1

2

1.

Wyeth bases this removal on diversity jurisdiction under 28 U.S.C. §§ 1332, 1441 *et seq.*

Removal under 28 U.S.C. §§ 1332, 1441 is appropriate because there is complete diversity of

citizenship between plaintiff and all properly joined defendants, no properly joined defendant is a

citizen of Louisiana, and the amount in controversy exceeds $75,000.

2.

Removal venue exists in the United States District Court for the Eastern District of

Louisiana, because the 40th Judicial District Court, Parish of St. John the Baptist, State of

Louisiana is within the Eastern District of Louisiana.  Wyeth is filing this Notice of Removal

within 30 days of receipt of the initial pleading by the first-served defendant, and within one year

of the commencement of this action as mandated by 28 U.S.C. § 1446(b).  *See Murphy Brothers,*

*Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).  Accordingly, removal of this action is

timely.

3.

On March 12, 2004 plaintiff filed this action asserting claims against:  (1) Wyeth; (2) Ion

Laboratories, Inc. ("Ion"), SmithKline Beecham Corporation ("SmithKline"), Medeva

477101.1

3

Pharmaceuticals, Inc. ("Medeva"), Fisons Corporation, Gate Pharmaceuticals (a division of Teva

Pharmaceuticals, USA) ("Gate"), Rugby Laboratories, Inc. ("Rugby"), Geneva Pharmaceuticals,

Inc. ("Geneva"), and Eon Labs Manufacturing, Inc. ("Eon") (together, the "Phentermine

Defendants"); (3) Indevus Pharmaceuticals, Inc. ("IPI")[2]; (4) Amy N. Howe, Candace O. Patten,

Robert Thomas, Leo A. Ascani, Jr., Chantel L. Leininger, Emile F. Mercante, Jr. and K. Todd

Masson (together "Wyeth Employee Defendants") and (5) Gem Drugs ("Gem") in the 40th

Judicial District Court, State of Louisiana in the proceeding entitled *Abertha Henderson  v.*

*American Home Products Corporation, et al,* bearing Docket No. 48574 on the general civil

docket of that court.  A copy of the Petition for Damages is attached as Exhibit A to this Notice

of Removal.

## **Diversity Jurisdiction**

4.

Removal of this action is appropriate under the diversity jurisdiction and removal

statutes, 28 U.S.C. §§ 1332, 1441 *et seq*.  All properly joined defendants are diverse from

---

[2]    On April 2, 2002, Interneuron Pharmaceuticals, Inc. changed its corporate name to Indevus Pharmaceuticals, Inc.

477101.1

plaintiff, the amount in controversy exceeds $75,000, and all properly joined defendants have consented to removal.

5.

Plaintiff asserts that she is a citizen of Louisiana. *See* Exhibit A. Accordingly, at the time plaintiff commenced this action and at the time of filing this Notice of Removal, plaintiff is a citizen of Louisiana for purposes of removal.

6.

Wyeth, IPI, and all of the Phentermine Defendants are incorporated in states other than Louisiana, and their principal places of business are located in states other than Louisiana: (1) defendant Wyeth is incorporated in Delaware, and its principal place of business is New Jersey; (2) defendant WPI is a Delaware corporation with its principal place of business in Pennsylvania; (3) defendant AHPSHC is a Delaware corporation with its primary address in Delaware; (4) IPI is incorporated in Delaware, and its principal place of business is Massachusetts; (5) defendant Ion Laboratories, Inc. is incorporated in Texas, and its principal place of business is Texas; (6) defendant SmithKline is incorporated in Pennsylvania and its principal place of business is Pennsylvania; (7) defendant Medeva is incorporated in Delaware, and its principal place of

477101.1

business is New York; (8) defendant Gate is incorporated in Delaware, and its principal place of business is Pennsylvania; (9) defendant Rugby is incorporated in New York and its principal place of business is not in Louisiana; (10) defendant Geneva is incorporated in Colorado, and its principal place of business is Colorado; and (11) defendant Eon is incorporated in Delaware, and its principal place of business is New Jersey. Thus, neither Wyeth, IPI, nor the Phentermine Defendants is a citizen of Louisiana and each is diverse from plaintiff.

## Consent

7.

Defendants IPI, Ion, Eon, Medeva, SmithKline Beecham, Rugby, and Geneva ("Phentermine defendants") have given their consent to this removal. *See* Exhibit B. Defendant, Fisons, was not effectively served therefore its consent is unnecessary. Based on information from Gate's counsel, defendant, Gate Pharmaceuticals, a division of Teva Pharmaceuticals, USA, was not properly served therefore its consent to removal is not required.

## Fraudulent Joinder of Phentermine Defendants

8.

477101.1

6

Although all properly served Phentermine Defendants have consented to this removal, the Phentermine Defendants have been joined as defendants in this action in an attempt to defeat removal to federal court in the event of a lack of consent. However, because these defendants have been fraudulently or improperly joined, the consent to removal even of properly served Phentermine Defendants is not required. The potential failure to consent of these defendants should not be allowed to defeat removal under 28 U.S.C. § 1441. Indeed, the Honorable Harvey Bartle, III in the United States District Court for the Eastern District of Pennsylvania ruled in a similar case that "plaintiffs have no real intention in good faith to seek a judgment against the phentermine defendants and that as a result the phentermine defendants are fraudulently joined in these actions." *See* Exhibit C at 422. Accordingly, Judge Bartle ruled that the lack of consent of the very same phentermine defendants that have been named here, "will be ignored in determining the propriety of removal" *Id.* The United States District Court for the Eastern District of Louisiana has twice followed Judge Bartle's decision in finding that phentermine defendants were fraudulently joined under facts nearly identical to this case. *See* Exhibit D, *Hitchen v. Wyeth*, 02-3146, 2003 WL 203099 (E.D. La. Jan. 28, 2003) and Exhibit E, *Gallagher v. Wyeth*, 02-3480 (E.D. La. February 14, 2003). Likewise, the potential failure to consent of

477101.1

7

these Phentermine Defendants in this case should not be allowed to defeat removal under 28 U.S.C. § 1441.

9.

Prior litigation by plaintiffs similarly situated to the plaintiff in this case has established that there is no reasonable basis for predicting that plaintiff can establish liability against the Phentermine Defendants. *See* Exhibits D and E. In over six years of diet drug litigation in both state and federal courts, no plaintiff has introduced admissible evidence establishing the liability of a phentermine defendant for the injuries alleged by plaintiff such as the one in this case. Moreover, no phentermine defendant has paid any amount in settlement or judgment in any diet drug case. Upon information and belief, there is an understanding between plaintiff and one or more Phentermine Defendants under which the Phentermine Defendant(s) will withhold consent to removal in exchange for plaintiff's agreement not to pursue claims against them. *See* Exhibit C.

10.

Plaintiff has made no allegations as to which of the Phentermine Defendants' products she ingested. Because product identification is an essential element of tort claims against

477101.1

8

manufacturers under Louisiana law, plaintiff has failed to state a cognizable claim against any of the Phentermine Defendants. Moreover, Phentermine Defendants whose products were not ingested are not properly joined in this suit and should not be allowed to defeat removal. These defendants' consent to removal should not be required.

## **Fraudulent Joinder of Gem Drugs**

11.

As set forth below, Gem has been fraudulently joined in this action in an attempt to defeat diversity jurisdiction. The Louisiana citizenship of this defendant must therefore be ignored for jurisdictional purposes.

12.

Gem was fraudulently joined because the allegations contained in Plaintiff's petition are insufficient to state a cause of action against Gem, the alleged retail seller of Redux and Pondimin. Plaintiff's allegations of liability against Gem are based on its alleged roll in filling a prescription for Redux or Pondimin written for the Plaintiff by her treating physician. Redux and Pondimin were FDA-approved prescription pharmaceutical products which were sold through

477101.1

9

thousands of pharmacies throughout the country.  Under Louisiana law, a seller who exercises no control over manufacture or quality of a product can not be liable for harm caused by the product unless the seller has knowledge of the dangerous characteristics of the product. La. C.Civ.P. art. 2545; *Winchell v. Johnson Properties, Inc.*, 642; 399 (La. App. 3rd Cir. 1994); *Reeves v. Great Atlantic & Pacific Tea Co.*, 370 So.2d 202 (La. App. 3rd Circuit), *writ denied*, 371 So.2d 835; 372 So.2d 568 (La. 1979).  Plaintiff has not alleged that Gem exercised any measure of control over manufacture or the quality of Redux or Pondimin or that Gem was aware of any dangerous characteristic of them.  Indeed, plaintiff has alleged that Wyeth actively concealed these claims from pharmacies.  Accordingly, plaintiff failed to allege facts sufficient to render Gem liable for any harm caused by the alleged dangerous characteristic of Pondimin or Redux; therefore Gem can have no manufacturing liability to its customers who purchase Redux or Pondimin under the allegations of this Petition.

13.

Nor has plaintiff alleged that Gem breached its limited duty to correctly fill and to warn patients of obvious errors in the prescriptions. *Gassen v. East Jefferson Gen. Hosp.*, 628 So.2d 256 (La. App. 5 Cir. 1993).  Plaintiff has not alleged that any prescription was improperly filled

477101.1

10

or that Gem failed to warn her of an alleged prescription error, and accordingly she has failed to allege any breach of duty.

14.

Because there is no reasonable possibility that Plaintiff will be able to succeed on her claim against Gem under the allegations set forth in this suit, Gem has been fraudulently joined in this action and should be ignored for purposes of diversity jurisdiction. *See, Strickland, et al. v. Brown, Morris, Pharmacy, Inc., et al.,* C/A No. 96-815, 1996, W.L. 537736 (E.D.La. 1996), *Green v. Amerada Corp.,* 707 F.2d 201 (5th Cir. 1983).

15.

Furthermore, the prescriptive period has run on claims against the Phentermine Defendants and Gem. La. C.C. art. 3492 specifies that delictual actions, such as this one, are subject to a liberative prescription of one year and that prescription commences to run from the day injury or damage is sustained. Because Pondimin and Redux were withdrawn from the market in September 1997, plaintiff could not have taken the medications within one year prior to the filing of this Petition. Additionally, the extensive publicity surrounding the withdrawal of Pondimin and Redux in September of 1997 put persons, like plaintiff, who allegedly used those

477101.1

11

drugs, on notice of any potential claims regarding their diet drug use at that time. *See* Exhibit F, *Moseley v. Wyeth*, CIV-02-1120-M (W.D. Okl. Sept. 13, 2002) (holding that plaintiff had constructive notice of her diet drug claims as a matter of law because of widespread publicity about the diet drug withdrawal and subsequent litigation); Exhibit G, *McKee v. Wyeth*, CIV-02-1119-C (W.D. Okl. Oct. 1, 2002) (adopting reasoning of *Moseley*); Exhibit H, *Haggard v. Wyeth*, CIV-02-446-S (E.D. Okl. October 8, 2002) (adopting reasoning of *Moseley* and *McKee*); Exhibit I, *McCurdy v. Wyeth*, No. 03-054-SS (W.D. Tex. Feb. 14, 2003). Indeed, both Wyeth and the FDA issued press releases on September 15, 1997 advising users of Pondimin, Redux, and/or the combination of Pondimin and phentermine to consult a physician. These press releases led to massive publicity in both the national and local media with repeated broadcasts advising diet drug users to contact their doctors. If plaintiff had done so, she would have discovered any injuries she might have sustained at that time - well before March of 2003, or one year before plaintiff filed her Petition for Damages. While Wyeth has agreed with plaintiff's counsel as part of the nationwide class action settlement agreement entered by the United States District Court for the Eastern District of Pennsylvania (the "National Settlement") that it would not assert a statute of limitations defense under specified circumstances, that limited agreement in no way

477101.1

12

extends to the Phentermine or Pharmacy Defendants.  Nor does Wyeth's agreement not to assert statute of limitations defenses in certain limited circumstances interrupt the accrual of prescription against the Phentermine Defendants or Gem.   Therefore, the Phentermine Defendants and Gem are improperly joined in this action, and their consent to removal should not be required.

16.

Plaintiff's claims against Gem are also perempted.  Any such claims are barred by the three year peremptory period for claims against healthcare providers La. R.S. ¶ 9:5628.  Such claims arose no later than September 1997, but plaintiff did not sue until almost six years later in March 2004.  Under analogous circumstances, this Court held that a non-diverse medical center defendant was fraudulently joined. *See Case v. Merck & Co., Civ. 02-1779*, 2002 WL 1897048 (E.D. La. Aug. 15, 2002); *see Kohl v. American Home Products Corp.*, 78 F. Supp. 885, 896-97 (W.D. Ark. 1999).

**Fraudulent Joinder of Wyeth Employee Defendants**

17.

477101.1

13

The Wyeth Employee Defendants, like the Phentermine Defendants and Gem, have been fraudulently or improperly joined as defendants in this action for the sole purpose or effect of defeating removal of this action to federal court. Thus, these defendants' citizenship should not be allowed to defeat diversity jurisdiction under 28 U.S.C. § 1332 or removal under 28 U.S.C. § 1441.

18.

The Wyeth Employee Defendants were improperly joined in this action for at least three reasons. First, plaintiff has failed to allege in the Petition that any plaintiff's doctor received any drugs from the Wyeth Employee Defendants or that the Wyeth Employee Defendants made any misrepresentations or failed to adequately warn any plaintiff's doctor. Consequently, plaintiff has failed to factually allege any connection between her alleged injuries and the Wyeth Employee Defendants, as required under Louisiana law. Under the learned intermediary doctrine, it is the duty of the manufacturer of a pharmaceutical product to warn only the prescribing physician of the risks of use of the product. *See, Willet v. Baxter Internat'l, Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991). Because plaintiff has not alleged that the Wyeth Employee

477101.1

14

Defendants made misrepresentations to her doctors, she has not alleged that the Wyeth Employee Defendants caused her alleged injuries.

19.

Second, plaintiff has further failed to state a claim that the Wyeth Employee Defendants are individually liable to her under *Canter v. Koehring Company*, 283 So. 2d 716 (La. 1973) because plaintiff has failed to allege that the Wyeth Employee Defendants breached a duty owed to her through personal fault. *See* Exhibit J, *Ursura Westbrook, et al vs. Wyeth, et al*, CIV 03-1918 (W.D. La. Dec. 22, 2003) (finding Wyeth sales representatives fraudulently joined under facts similar to this case). Thus, there is no possibility of recovery against these defendants personally under Louisiana law, and so they are fraudulently joined. *See Couvi's Drink Box, Inc. v. Philip Morris USA*, 1994 WL 202319 (E.D. La. 1994).

20.

Third, under Louisiana law, any liability of the Wyeth Employee Defendants in their official (rather than individual) capacity runs only against the corporation which is vicariously liable for the torts of its employees committed in the course and scope of their employment. *See,*

477101.1

15

*e.g., Sims v. Jefferson Downs Racing Association*, 778 F.2d 1068, 1081 (5th Cir. 1985). Outside of an action against an employee personally, a plaintiff does not have a cause of action against both the corporation and its employee in his or her official capacity. *Sims*, 778 F.2d at 1081. Therefore, plaintiff's claims are barred to the extent they are asserted against the Wyeth Employee Defendants in their official capacity.

21.

Because all properly-joined defendants have citizenship that is diverse from the citizenship of plaintiff, there is complete diversity for purposes of 28 U.S.C. §§ 1332, 1441.

**Amount in Controversy**

22.

Although the Petition for Damages seeks an unspecified amount of compensatory damages, it is facially apparent from the Petition that the amount in controversy between plaintiff and the defendants exceeds the sum or value 'of $75,000. The plaintiff alleges that she has sustained injuries including serious and permanent injuries to the heart, pulmonary system and/or neurological and other physical injuries associated with her use; physical disabilities, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of diagnostic

477101.1

16

testing, hospitalization, medical and nursing care and treatment, loss of earnings and loss of the ability to earn money. *See* Exhibit A, 61.¶ The Settlement Court has found that claims for injuries less serious than these, for example for medical monitoring alone, combined with possible future injury, meet the jurisdictional amount of the Court. *See Albrechinski v. American Home Products*, Civ. No. 98-20488, PTO No. 738; *Petrou v. Wyeth-Ayerst Laboratories Co.*, Civ. No. 98-20072, PTO No. 723. Therefore all requirements are met for removal under 28 U.S.C. §§ 1342, 1441.

23.

Written notice of the filing of this Notice of Removal is being delivered to all parties through their counsel of record. A copy of the Notice of Removal will be filed with the Clerk of Court for 40th Judicial District Court, for the Parish of St. John the Baptist, State of Louisiana.

WHEREFORE Wyeth prays that the above entitled state court action, now pending in the 40th Judicial District Court for the Parish of St. John the Baptist, State of Louisiana, be removed to the United States District Court for the Eastern District of Louisiana.

477101.1

17

RESPECTFULLY SUBMITTED,

**HENRI WOLBRETTE, III (13631)**
**KATHLEEN A. MANNING (9101)**
**ANN DE GROFF LEVINE (21717)**
**ANNE L. POINTER (27607)**
McGLINCHEY STAFFORD, PLLC
643 Magazine Street
New Orleans, Louisiana   70130
Telephone: (504) 586-1200
Facsimile: (504) 596-2800

ATTORNEYS FOR DEFENDANTS,
WYETH, WYETH PHARMACEUTICALS INC.
and AHP SUBSIDIARY HOLDING
CORPORATION

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all

counsel of record by placing a copy of same in the United States mail, postage prepaid and

properly addressed, this _15_ day of April, 2004.

ANNE L. POINTER

477101.1

18

40th JUDICIAL DISTRICT COURT FOR ST. JOHN THE BAPTIST PARISH

STATE OF LOUISIANA

NUMBER: 48574                    DIVISION: _

ABERTHA HENDERSON

VERSUS          **Div. B**

AMERICAN HOME PRODUCTS,CORPORATION;
DAWNE STAGG;AMY N. HOWE;
ARTHUR H. MCGEHEE, JR.;CANDACE C. PATTEN;
ROBERT THOMAS;LEO A. ASCANI, JR.,;
CHANTEL L. LEININGER;EMILE F. MERCANTE, JR.;      RECEIVED
K. TODD MASSON; ION LABORATORIES, INC.;
SMITHKLINE BEECHAM; CORPORATION; MEDEVA       MAR 2 3 2004
PHARMACEUTICALS, INC.; FISONS CORPORATION;
GATE PHARMACEUTICALS, a division of TEVA PHARMACEUTICAL LEGAL DIVISION
USA;, RUGBY LABORATORIES, INC.; GENEVA PHARMACEUTICALS,
INC.; WYETH-AYERST PHARMACEUTICALS, INC., f/k/a
Wyeth-Ayerst Laboratories, Inc., a division of American Home Products, Inc.
WYETH LABORATORIES COMPANY; INTERNEURON PHARMACEUTICALS;
INC.; A.H. ROBINS COMPANY, INC.; EON LABS MANUFACTURING, INC., and GEM
DRUGS - RESERVE

PETITION FOR DAMAGES

NOW INTO COURT, by and through undersigned counsel, comes Plaintiff, ALBERTHA

HENDERSON a resident of the full age and majority, and a resident of the Parish of St. John the

Baptist, State of Louisiana, filing suit against the Defendants named herein, showing the Court as

follows, to-wit:

1.

Plaintiff has incurred injuries and damages arising out of her use of the diet drugs Redux,

Pondimin and Phentermine.

2.

This court has subject matter jurisdiction because this is an action by individuals who are a

citizens of the State of Louisiana and who have exercised their rights to an intermediate opt-out of the

AHP SETTLEMENT TRUST.

3.

Venue is proper in this court because the plaintiffs consumed and purchased the diet

drugs Redux, Pondimin and Phentermine in this parish, or both, making venue proper under

-1-



Louisiana Civil Code and Procedure Article 74.

4.

It has become necessary for Plaintiff to bring this action because of injuries and damages sustained during their use of the drugs Redux, Pondimin and/or Phentermine. Plaintiffs did purchase the diet drugs Redux, Pondimin and Phentermine in Louisiana, and Defendants advertised and received substantial compensation and profits from sales of the diet drugs in Louisiana, and made material omissions and misrepresentations and breached warranties in Louisiana. Defendants are jointly and solidarily liable to the Plaintiffs.

5.

Defendants are the manufacturers, marketers, wholesalers, distributors and sellers of drugs and/or compounds containing the diet drugs dexfenfluramine (also known as Redux), fenfluramine (also known as Pondimin), and/or "fen-phen" (fenfluramine and phentermine) (hereinafter collectively referred to as "the diet drugs") and may be served with process as follows:

6.

The Defendant, Dawne Stagg, is a resident of Louisiana, and her principal place of business is located in Brusly, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and
at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

7.

The Defendant, Amy N. Howe, is a resident of Louisiana, and her principal place of business is located in Baton Rouge, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

8.

The Defendant, Arthur J. McGehee, Jr., is a resident of Louisiana, and his principal place of business is located in Baton Rouge, Louisiana. At all times material hereto, this Defendant was in the

business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

9.

The Defendant, Candace Cherise Patten, is a resident of Louisiana, and her principal place of business is located in Baton Rouge, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

10.

The Defendant, Robert Thomas, is a resident of Louisiana, and his principal place of business is located in Zachary, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

11.

The Defendant, Leo A. Ascani, Jr , is a resident of Louisiana, and his principal place of business is located in Metairie, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

12.

The Defendant, Chantel L. Leininger, is a resident of Louisiana, and her principal place of business is located in Metairie, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all

business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

9.

The Defendant, Candace Cherise Patten, is a resident of Louisiana, and her principal place of business is located in Baton Rouge, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

10.

The Defendant, Robert Thomas, is a resident of Louisiana, and his principal place of business is located in Zachary, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

11.

The Defendant, Leo A. Ascani, Jr , is a resident of Louisiana, and his principal place of business is located in Metairie, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

12.

The Defendant, Chantel L. Leininger, is a resident of Louisiana, and her principal place of business is located in Metairie, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all

times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

13.

The Defendant, Emile F. Mercante, Jr., is a resident of Louisiana, and his principal place of business is located in Metairie, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

14.

The Defendant, K. Todd Masson, is a resident of Louisiana, and his principal place of business is located in Metairie, Louisiana. At all times material hereto, this Defendant was in the business of promoting, marketing, selling, and/or distributing the diet drugs known as Redux, Pondimin and/or Phentermine, individually and/or in combination, in the State of Louisiana, and at all times material hereto, this Defendant does and did business in the State of Louisiana and sold the aforementioned drugs in the State of Louisiana.

15.

The Defendant, ION LABORATORIES, INC., is a Texas corporation with its principal place of business in Fort Worth, Texas. This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

16.

The Defendant, SMITHKLINE BEECHAM CORPORATION, is a Tennessee corporation with its principal place of business in Bristol, Tennessee. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling and/or distributing the pharmaceutical drug phentermine hydrochloride, also known as Fastin (hereinafter referred to as "Phentermine"), on information and belief, in the State of Louisiana.

17.

This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

18.

Defendant, MEDEVA PHARMACEUTICALS, INC. is now known as CELLTECH MEDEVA. CELLTECH MEDEVA f/k/a MEDEVA PHARMACEUTICALS, INC. is a Delaware corporation. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling and/or distributing the pharmaceutical known as phentermine in the State of Louisiana. This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

19.

The Defendant, FISONS CORPORATION is now known as CELLTECH MEDEVA. CELLTECH MEDEVA f/k/a FISONS CORPORATION is a Delaware corporation. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling and/or distributing the pharmaceutical known as phentermine in the State of Louisiana. This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

20.

The Defendant, GATE PHARMACEUTICALS, A DIVISION OF TEVA PHARMACEUTICALS, USA is a Delaware corporation with its principal place of business in the State of Pennsylvania. At all times material hereto this Defendant was in the business of manufacturing, promoting, marketing, developing, selling and/or distributing the pharmaceutical drug phentermine hydrochloride, also known as Adipex-P (hereinafter referred to as "Phentermine"). This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

21

The Defendant, RUGBY LABORATORIES, INC., was formerly known as Modern Wholesale Drug Co., Inc. and is now known as Watson Laboratories. Watson Laboratories is a California corporation. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling and/or distributing the pharmaceutical phentermine hydrochloride, hereinafter referred to as Phentermine in the State of Louisiana. This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

22.

The Defendant, GENEVA PHARMACEUTICALS, INC., is a Colorado corporation. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling, and/or distributing the pharmaceutical phentermine hydrochloride, hereinafter referred to as "Phentermine", in the State of Louisiana. This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of

such business done in the State of Louisiana.

22.

The Defendant, INTERNEURON PHARMACEUTICALS, INC. is a foreign corporation, not authorized to do but doing business in this State, which is a citizen of a state other than Louisiana for purposes of diversity jurisdiction, and which at all relevant times was the manufacturer, marketer and/or seller of dexfenfluramine, fenfluramine and/or fen-phen, which drugs were developed, manufactured, transported to Louisiana, and sold to residents and domiciliaries of Louisiana, in interstate commerce; times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling, and/or distributing the pharmaceuticals known as Pondimin and Redux. This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

23.

The Defendant, EON LABS MANUFACTURING, INC., is a Delaware corporation. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling, and/or distributing the pharmaceutical phentermine hydrochloride, hereinafter referred to as "Phentermine", in the State of Louisiana. This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Said Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana

24

The Defendant, WYETH-AYERST PHARMACEUTICALS, INC. f/k/a Wyeth-Ayerst Laboratories, Inc, a division of American Home Products, Inc., is a Delaware Corporation and a subsidiary of American Home Products Corporation. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling and/or distributing the

pharmaceuticals known as Pondimin and Redux.

25.

This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Wyeth-Ayerst Pharmaceuticals, Inc. f/k/a Wyeth-Ayerst Laboratories, Inc., a division of American Home Products, Inc. has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

26.

Defendant, WYETH LABORATORIES COMPANY is a subsidiary of American Home Products Corporation, and has its principal place of business in Philadelphia, Pennsylvania. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling and/or distributing the pharmaceutical drugs fenfluramine, also known as Pondimin (hereinafter referred to as "Pondimin") and dexfenfluramine hydrochloride, also known as Redux (hereinafter referred to as "Redux").

27.

This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. Wyeth Laboratories, Inc. has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

28.

The Defendant, AMERICAN HOME PRODUCTS CORPORATION, is a Delaware corporation. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling, and/or distributing the pharmaceuticals known as Pondimin and Redux.

29.

This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. The Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but

does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

30.

The Defendant, A. H. ROBINS COMPANY, INC., was a Delaware Corporation with its principal place of business in Richmond, Virginia and a subsidiary of American Home Products Corporation. On August 3, 1998, A.H. Robins Company was merged into American Home Products and ceased to exist as a separate entity. At all times material hereto, this Defendant was in the business of manufacturing, promoting, marketing, developing, selling, and/or distributing the pharmaceutical known as Pondimin.

31

This Defendant does and did business in Louisiana and developed, manufactured and sold the aforementioned drugs in interstate commerce and in the State of Louisiana. The Defendant has sufficient business contacts with the State of Louisiana to make it amenable to service of process, but does not maintain a regular place of business or a designated agent upon whom service of process may be had for causes of action arising out of such business done in the State of Louisiana.

32.

The defendant, GEM DRUGS - RESERVE   designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed the drugs  and  knew of their intended, reasonably foreseeable and/or ordinary use.

33.

Plaintiffs, in purchasing the drugs reasonably relied upon the skill and judgment of Defendant GEM DRUGS – RESERVE  as to whether it was of merchantable quality and safe and fit for its intended, reasonably foreseeable and/or ordinary use.

34.

As used herein, Phentermine Defendants shall include each and every manufacturer, promoter, marketer, developer, seller and/or distributor of the pharmaceutical phentermine and/or phentermine hydrochloride.

35.

As used herein, AHP Defendants refers collectively to Defendants, Wyeth Laboratories, Inc., Wyeth-Ayerst Laboratories Company, A.H. Robins Company, Inc. and American Home Products Corporation.

36.

As used herein, Sales Representative Defendants refers collectively to Defendants, DAWNE STAGG, AMY N. HOWE, ARTHUR J. MCGEHEE, CANDACE C. PATTEN, ROBERT, THOMAS, LEO A. ASCANI, JR., CHANTEL L. LEININGER, EMILE F. MERCANTE, JR and K. TODD MASSON.

37.

The Food and Drug Administration (FDA) approved fenfluramine and phentermine separately for use as weight reduction drugs for the short-term medical management of obesity. Since that time, fenfluramine has been increasingly prescribed and used in combination with the drug phentermine to maximize weight loss. This combination is commonly known as fen-phen.

38.

The phen portion consists of phentermine, an amphetamine which helps the body burn calories faster and counteracts the drowsiness caused by the fen portion of the dosage, which consists of fenfluramine or dexfenfluramine, drugs which affect the serotonin levels in the brain

39.

The drug Pondimin, also known as fenfluramine, contains 50% dexfenfluramine as its active ingredient, which is precisely the same active ingredient contained in the drug Redux, which is 100% dexfenfluramine.

40.

The United States Food and Drug Administration has never approved the use of Pondimin/fenfluramine and phentermine in combination, or the use of Redux/dexfenfluramine and fen-phen in combination, for weight loss. Defendants are and have been aware that dexfenfluramine, fenfluramine and phentermine have been prescribed and used in combination for weight loss, despite the fact that the use of such drugs in combination has never been approved by the FDA.

41.

At all material times, defendants, either themselves or by use of others, designed, assembled, packaged, marketed, advertised, manufactured, labeled, tested, promoted, distributed, and/or sold the drugs Redux, Pondimin and/or Phentermine and otherwise distributed these drugs in interstate commerce. The drugs were advertised as effective weight control drugs. Defendants were in control of the design, assembly, packaging, marketing, advertisement, manufacture, labeling, testing, promotion, distribution and/or sale of the diet drugs. Defendants made filings with the United States Food and Drug Administration in connection with the approval process for the diet drugs in the United States.

42.

At all times material hereto, the Defendants herein either knew or should have known that the drugs Pondimin, Redux and/or Phentermine were causally related to and associated with severe and life threatening complications and side effects including, but not limited to, pulmonary hypertension, cardiac valvular disease and disorders, neurotoxicity, central and peripheral nervous system toxicity, brain serotonin neurotoxicity, cerebral hemorrhage, ischemic stroke, neurocognitive dysfunction and developmental neurotoxicity.

43.

Defendants marketed the diet drugs widely to induce the widespread use of the diet drugs. Defendants purposely downplayed and understated the health hazards and risks associated with the diet drugs. Defendants falsely and fraudulently misrepresented a number of facts regarding the diet drugs including, without limitation the adequate testing of the diet drugs; the adequate testing of the combination of the diet drugs; the severity and frequency of side effects and adverse medical conditions caused by the diet drugs.

44.

The tortious acts by the Defendants and each of them were committed in their individual and/or corporate capacity, and include but are not limited to the following:

Defendants and each of them directly and/or indirectly, negligently and/or defectively made, created, manufactured, assembled, designed, sterilized, tested, labeled, supplied, packaged, distributed, marketed, advertised, warned, and/or sold, in the state of Louisiana, the drugs Redux,

Pondimin and/or Phentermine.

45.

The tortious acts by the Sales Representative Defendants and each of them were committed in their individual and/or corporate capacity, and include but are not limited to the following:

    a.    Sales Representative Defendants failed to convey adequate warnings to the Plaintiffs through the prescribing physicians.

    b.    Sales Representative Defendants were in the business of marketing, promoting, selling and/or distributing the unreasonably dangerous pharmaceutical drugs Redux, Pondimin and/or Phentermine, which have caused harm to the Plaintiffs.

    c.    Sales Representative Defendants negligently distributed, marketed, advertised and/or promoted the dangerous diet drugs Redux, Pondimin and/or Phentermine.

    d    Sales Representative Defendants made negligent misrepresentations regarding the safety and efficiency of the dangerous diet drugs Redux, Pondimin and/or Phentermine.

    e.    Sales Representative Defendants negligently failed to provide sufficient instructions to the Plaintiffs and/or their prescribing physicians regarding the use of said drugs, alone or in combination.

46.

By way of further example, but not limitation, specific misrepresentations and active concealment include the following facts, which were never disclosed to the Plaintiffs, the Plaintiffs' prescribing physicians, or to the general public:

    a.    That Pondimin, Redux and phentermine have substantial structural similarities to amphetamines and aminorex fumarate. All of those drugs are phenylalkylamines.

    b.    That amphetamines had been embroiled in controversy in the 1960's and 1970's when they were used as weight loss agents and aminorex fumarate, another drug used for weight loss, caused an epidemic of PPH in Europe in that same time frame.

    c.    That there was published medical literature from the 1960's and 1970's which found that fenfluramine effected the function of the cardiovascular system and described fenfluramine as being cardiotoxic.

d.   That in 1977, an article was published which noted that fenfluramine might cause thickening of the blood vessels in the lung similar to what is seen in carcinoid heart disease.

e.   That in 1981, an article by Douglas, et al. demonstrated that fenfluramine can cause Primary Pulmonary Hypertension, PPH;

f.   Contained in the files of A.H. Robins was a 1982 document noting that an FDA official had warned that both Pondimin and phentermine cause PPH and warned against combining the two drugs.

g.   That as early as 1988, fenfluramine was voluntarily withdrawn from the market. This fact was also actively concealed from the FDA in the Pondimin New Drug Application annual reports, in knowing violation of FDA regulations.

h.   That in 1990, within months after acquiring Pondimin from A.H. Robins, AHP was put on notice by Servier that the Pondimin labeling was probably inadequate and needed to be revised.

i.   That on March 2, 1990, representatives of Servier met with top executives at Wyeth and, among other things, told Wyeth that there might be a need to update the labeling for fenfluramine which had been created in 1972.

j.   That despite this warning that the Pondimin labeling was outdated, no changes were made to the labeling between 1990 and mid-1996

k.   In that time period, several things happened in the marketplace that motivated concealment of the safety hazards of Pondimin and Redux.

l.   There was an explosion in Pondimin sales after 1992. Internal documents demonstrate that the sale of Pondimin tablets doubled every year after 1992 after the publication of several articles by Dr. Michael Weintraub touting the combination use of Pondimin and phentermine.

m.   This drug combination became popularly known as the Fen-Phen fad.

n.   The rationale behind the combination use was that it would mitigate the irritating side effects of both drugs thus permitting long term use of the drugs even though the product labeling of each stated that the drug was to be used for only a few weeks  Because drowsiness was often associated with Pondimin use while a feeling of being stimulated

was often associated with the use of phentermine, the Fen-Phen combination involved taking phentermine in the morning when the patient would not object as much to being stimulated and taking fenfluramine in the evening when drowsiness would be tolerable or even desired.

o.  However, since there were only a relatively small number of patients in the Weintraub studies who took the combination for long periods of time, Fen-Phen was essentially untested for either safety or efficacy.

p.  Despite the fact that Defendants were well aware of the dramatic increased off-label use of Pondimin with phentermine, and for periods of time far beyond that mentioned in the Pondimin labeling, these companies did no studies to evaluate either the safety or efficacy of the combination use.

q.  In fact, in order to maximize profits on the phentermine, which was generally much better tolerated by the patients when prescribed in combination with Pondimin or Redux, phentermine manufactures and distributors, including Eon, directly and/or indirectly lobbied pharmacies and AHP to ensure that the pharmacies kept enough Pondimin or Redux in stock so as to maximize the off-label, combination use, which had never been approved by the FDA.

r   Moreover, although an FDA official warned that there were too many adverse reaction reports with the combination and that he wanted AHP DEFENDANTS to discourage combination use, the Defendants did not actively discourage the use of Fen-Phen.

s.  In fact, in October of 1996, officials from Eon, including Irwin Wechsler, Arthur Hurwitz, and Shelly Kaplan, were so excited about the profit potential of the combination and unapproved use of phentermine and fenfluramine, that Shelly Kaplan was charged with the task of exploring ways to source both phentermine and fenfluramine.

t.  During this same time period and because of the greatly increased demand and profits brought about by the active concealment of all the Defendants in this action regarding the combination use of fenfluramine and phentermine, Dr. Bernhard Hampl, the CEO

of Eon labs, agreed with other manufacturers to manufacture phentermine under Eons Abbreviated New Drug Application (ANDA).

u.  While Pondimin usage was doubling every year after 1992, dollar sales were increasing at an even higher rate because AHP DEFENDANTS increased the price of the drug as demand surged. Thus, dollar sales of Pondimin went from about $8.5 Million in 1994 to over $45 Million in 1995 to over $150 Million in 1996.

v.  Gross profit on sales of Pondimin was in excess of 90% in each of those years.

w.  Indeed, Pondimin sales were growing so fast that at times AHP DEFENDANTS literally could not make it fast enough to supply demand.

x.  In the summer of 1994, when Pondimin sales were sky-rocketing, AHP acquired American Cyanamid, another pharmaceutical company

y.  American Cyanamid had previously acquired a license from Interneuron Pharmaceuticals Inc. (IPI) to market Redux in the U S. and Canada if the Redux New Drug Application (NDA) was approved by the FDA.

z.  By acquiring American Cyanamid, AHP also acquired the rights to market Redux in the U.S.

aa. In the fall of 1994 Redux was being touted in the press as potentially being a $5 Billion Drug if American Home, Interneuron and Servier could get it approved for marketing by the FDA.

bb. But, as early as the Fall of 1994, AHP was afraid that concerns about PPH and potential neurotoxicity with Redux could perhaps block approval of the NDA or result in labeling restrictions that would greatly limit Redux sales even if marketing was permitted.

cc. Indeed, in a September 29, 1994 memorandum from Dr. Albert Derivan to Dr. Joseph Pitelli discussing the risks of neurotoxicity and PPH, Derivan stated, "This is a bleak picture for dexfenfluramine If this information is correct, I don't see even a remote chance for FDA approval."

dd  Moreover, AHP's market research demonstrated that even if Redux were approved, sales of this potential $5 Billion Drug and Pondimin sales as well could be devastated if doctors and patients became aware of and concerned about the risks of PPH with

these drugs. For example, the June 29, 1995 Pre-launch Marketing Plan for Redux noted that: "Generally, consumers are wary of existing prescription weight loss products, and are unimpressed by their efficacy. They also have serious concerns of safety (consumers declare they are unwilling to tolerate any risk)."

ee.   Several market research studies undertaken by AHP sought to quantify the loss of sales that would result with various forms of warnings about PPH. A February 23, 1995 memo noted that: "Interim sales forecasts (conducted by marketing) suggest that dexfenfluramine's sales could peak at $100 million to under $900 million dollars in 1998, if dexfenfluramine's labeling includes either a black box warning or a warning regarding primary pulmonary hypertension, respectively, and is used for 22 weeks."

ff.   Thus, AHP's market research predicted that if the Redux labeling contained an enhanced warning about the risk of PPH it could cost AHP $800 million in sales per year.

gg.   The risk of PPH with the use of anorexigenic drugs was not a new concern in 1989 when AHP acquired A.H. Robins and took over the responsibility for the marketing and safety surveillance of Pondimin.

hh.   As noted previously, aminorex fumarate, another anorexigenic drug in the same phenylalkylamine class of drugs as Pondimin and phentermine had caused an epidemic of PPH in Germany, Switzerland and Austria in the late 1960's and early 1970's. The aminorex epidemic was a "wake-up call" to the scientific and industrial community because it demonstrated that anorexic drugs could cause PPH and placed drug companies on notice that similar drugs might also cause epidemics of PPH.

ii.   Unfortunately, this warning was virtually ignored and concealed from users and prescribers of Pondimin and Redux by AHP, and from users and prescribers of phentermine by the Phentermine Defendants.

jj.   Reports of PPH associated with fenfluramine began to appear in the early 1980's.

kk.   The causal connection between PPH and fenfluramine was established no later than 1981 when Dr. J. G. Douglas and others published their article "Pulmonary Hypertension and Fenfluramine" (British Medical Journal, Vol. 283, March 10, 1981).

ll.   In that article, the authors reported on two females who had developed PPH after

taking fenfluramine for eight months. Upon withdrawing the drug the signs and symptoms of pulmonary hypertension temporarily abated in both cases. In one patient, however, fenfluramine was again administered after the patient regained weight and six weeks later the signs and symptoms of PPH reappeared.

mm.    In the medical and scientific world, this phenomenon is referred to as a "re-challenge" and such a result in even a single case is very strong evidence that the drug causes the disease. nn.    This case report by Douglas et al, established in the minds of the medical community which deal with PPH, that fenfluramine did in fact cause the disease. In fact, the proposition that fenfluramine can cause PPH was brought to the specific attention of A H. Robins in 1982 when a medical officer at the FDA told a representative of the company that both fenfluramine and phentermine can cause PPH and cautioned against the combined use of those drugs.

oo.    Beginning in 1987 and continuously through 1996 the Pondimin labeling stated the following with respect to the risk of PPH: "There have been four cases of pulmonary hypertension reported in association with fenfluramine use. Two cases were apparently reversible after discontinuation of fenfluramine, but evidence of pulmonary hypertension recurred in one of these patients upon rechallenge with fenfluramine  A third patient was initially improved with nifedipine treatment, but was noted to have increased pulmonary arterial pressure again at a four month follow up visit. Finally an irreversible and fatal case of pulmonary hypertension has been reported in a patient who had seven 1-month courses of fenfluramine in the twelve years prior to death. Patients taking fenfluramine should be advised to report immediately any deterioration in exercise tolerance "

pp    At least as early as 1991, AHP knew that this warning was false and misleading because in that year it received notice of three additional reports of PPH. Also, in 1990, 1991, 1992 and 1993 medical articles were published about the risk of PPH with fenfluramine  Yet, despite all of these additional reports AHP did nothing to strengthen the warning language about PPH.

qq.    In June of 1994, Dr  Fred Wilson, the medical monitor who was the physician in charge of safety surveillance for Pondimin wrote to Amy Myers, a Safety Surveillance

Specialist, thanking her for providing a computer printout regarding the number of pulmonary hypertension cases which had been reported with Pondimin.

rr.     He also stated: "I have been concerned that our approved labeling contains only four such cases when in fact we have a total of 37 reports in addition to those mentioned in the labeling.  I will draft a suggested labeling revision for approval."

ss.     Dr. Wilson did in fact draft a new PPH warning for Pondimin and Barry Sickels, in AHP's Regulatory Affairs department, advised those working on the project that the new labeling could be implemented immediately as a "Special Supplement - Changes Being Effected".

tt.     This exception to FDA regulations does not require prior FDA approval of labeling changes intended to communicate new safety information to physicians. Thus, physicians could have been warned immediately that the company had received 10 times as many reports of the deadly disease than were reported in the labeling.  But AHP deliberately chose not to make any change to the labeling in the Summer or Fall of 1994, and to provide false and misleading information in its product labeling for Pondimin.

uu.     What did happen in that time period is that AHP acquired American Cyanamid and the rights to market Redux, a drug that was popularly thought to be extremely lucrative.

vv.     An October 24, 1994 article in the Journal of the American Medical Association stated: "The stakes for dexfenfluramine's approval are high.  Given the increase in overweight Americans and the nation's obsession with being thin, new weight control medications that are effective and non-addicting face an immense commercial market.  One FDA official says dexfenfluramine has been referred to as "the $5-billion drug".  There's just one catch.  A handful of researchers have published animal studies that they say raise a red flag   They say that their data show evidence of neurotoxicity sufficient to warrant further study rather than FDA approval any time soon "

ww.     But the potential neurotoxicity of Redux (and of Pondimin because it is so closely related to Redux) was not the only or even the biggest red flag threatening approval of Redux and the continuing explosive growth of Pondimin sales.  On February 17,

1995, the FDA wrote to IPI informing it that the Redux NDA was non-approvable and the principal reason for that was because "the application [did] not contain adequate safety data to define the risk of developing pulmonary hypertension."

xx. As noted previously, by this time -- February of 1995 -- AHP was already concerned the FDA might require it to have a black box warning about PPH in the Redux labeling and it had conducted market research which showed that with a black box warning, Redux sales could only be a fraction of what AHP hoped for. AHP⊔s analysis of that research also demonstrates that the company was fully aware that its warning about PPH in the Pondimin labeling was inadequate.

yy. The analysis stated, "A weight maintenance positioning strategy is still possible with a primary pulmonary hypertension warning, because physicians may overlook the warning, as they currently do with other drugs".

zz. Thus, AHP's market research told it that physicians were in fact overlooking the demonstrably false warning about PPH in the Pondimin labeling. What is particularly outrageous is that the marketing memo does not discuss the need to change the Pondimin labeling to draw physicians' attention to the problem they were overlooking but rather indicates AHP's ardent hope that physicians would also overlook a mere warning about PPH if it was in the Redux labeling

aaa. Indeed, that conclusion is underscored by another market research summary which stated that the "best case" would be if "All [patients] are unaware of PPH and MD chooses not to enlighten them, or does so in a way that does not diminish interest".

bbb. Thus, AHP DEFENDANTS believed it was in their best interest to have consumers uninformed about the deadly risk of PPH.

ccc. The PHENTERMINE DEFENDANTS also sought to keep consumers and prescribing physicians uninformed about the true risk of PPH, including the Plaintiff and his/her prescribing physician.

ddd. For example, in approximately 1996, the CPMP, the European agency charged with regulating prescription drugs, required phentermine manufactures to include a prominent "Black Box" warning regarding the risks of PPH associated with phentermine.

eee.     Although this fact was known to phentermine manufacturers around the world, these manufactures actively concealed this fact from prescribing physicians and consumers, including the Plaintiff and his/her prescribing physician, and misrepresented the risk of PPH by failing to place any such warning in the package insert for phentermine.

fff.     Furthermore, although the Defendants were aware that phentermine was a mono-oxidase inhibitor (MAOI), which was contraindicated when prescribed with fenfluramine and dexfenfluramine, these defendants actively concealed this fact from the Plaintiff and his/her prescribing physician.  By failing to disclose the MAOI properties of phentermine and that it should not be used in combination with fenfluramine, the package insert for phentermine implicitly and falsely stated to Plaintiff□s prescribing physician that the drug was not an MAOI and could be prescribed in combination with fenfluramine. Similarly, by failing to disclose these same facts, the package insert for fenfluramine implicitly and falsely stated to Plaintiff□s prescribing physician that it could be prescribed in combination with phentermine.

ggg.     At around this same general time frame, early 1995, another huge cardiovascular problem with the use of fenfluramine and phentermine became evident -- the valvular heart disease ("VHD") problem.

hhh.     In 1993, AHP DEFENDANTS received a report of VHD associated with Pondimin from Servier which occurred in Belgium.

iii.     In March, April and May of 1994, AHP DEFENDANTS received another 10 reports of VHD associated with Pondimin use, five of which were received on a single day on April 19, 1994.

jjj.     On January 5, 1995, AHP received further information about VHD in Pondimin users, which a responsible pharmaceutical company could not ignore -- yet AHP chose to ignore it.  On that date, AHP received follow-up reports on 7 of the cases of VHD which had been originally reported in 1994 and 6 new reports of VHD.

kkk.     Thus, on a single day in January of 1995, the safety surveillance department of AHP received 13 reports of VHD in Pondimin users.  AHP received additional new reports of VHD later in January and in February, July and August of 1995.

lll.    During the same time frame or shortly thereafter, the PHENTERMINE
        DEFENDANTS, began to receive reports VHD in association with phentermine and
        fenfluramine.

mmm.   Although neither the phentermine nor the Pondimin labeling made mention of VHD,
        Defendants failed to obtain any more information about these reports from the
        treating doctors or the patients; it made no attempt to have the reports evaluated by
        any cardiologists; it did no further testing or analysis of any sort; and AHP
        DEFENDANTS apparently made no attempt to look back through its computer
        database to look for other reports of VHD. AHP DEFENDANTS did not even report
        many of these cases to FDA.

nnn.   FDA regulations require that foreign reports of adverse reactions only need to be
        reported if they are both "serious and unexpected".

ooo.   The reports of VHD with Pondimin in 1994 and 1995 were obviously "unexpected"
        since the labeling contained no warning of that adverse reaction and the occurrence of
        valvular heart disease in relatively young Pondimin users was also obviously a serious
        matter, as demonstrated by the fact that both Pondimin and Redux were taken off the
        market more than two years later when this problem finally became public knowledge.
        Because both Pondimin and Redux had been used more extensively in Europe than in
        the U.S., AHP DEFENDANTS should have regarded the 1994-1995 reports of VHD
        as an early warning signal of what was likely to happen in the U.S.

ppp.   However, because of its desire to conceal safety problems and not derail the
        exponential growth of Pondimin or the pending approval of Redux (which was
        already on shaky ground due to concerns of neurotoxicity and PPH) AHP
        DEFENDANTS instead chose to use the peculiarities of FDA regulations regarding
        the reporting of foreign adverse reactions as an excuse not to report the VHD
        problem.

qqq.   Thus, to keep this adverse safety information from being reported in 1995, AHP
        DEFENDANTS mischaracterized many of the reports as ⬚non-serious⬚ and did not
        report them to FDA, to the plaintiff, or to the plaintiff⬚s physician.

rrr.    One of the most flagrant examples of this type of intentional mischaracterization was

AHP's treatment of a July 24, 1995 report which noted that a patient taking Pondimin experienced "Aortic failure (stage 3/4); mitral failure (stage 2/4); and tricuspid failure". Despite the fact that this patient suffered failure of three out of the four valves in her heart, AHP characterized this report as "non-serious" and did not report it to FDA.

sss.    Another red flag popped up in June of 1995 when AHP learned that the French Regulatory authorities required that the dexfenfluramine labeling in France contain a black box warning for PPH and which advised physicians the drug was a second line treatment that could only be used after other methods of weight loss had failed and which also restricted use of the drug to only three months except under special circumstances.

ttt.    These restrictions devastated sales of dexfenfluramine in Europe and AHP was adamant it would not let that happen in the U.S.

uuu.    By June of 1995, there still had been no change of the Pondimin PPH labeling. However, Patti Acri, head of the labeling department at AHP, revived the issue by preparing a Form 5785 to accomplish the labeling change that had been raised by Dr. Wilson and Amy Myers a year earlier in 1994.

vvv.    The Form 5785 was signed off by all of the appropriate corporate executives and the labeling change was supposed to be carried out as a "Special Supplement -- Change Being Effected"; a special procedure under FDA regulations which allows a drug company to immediately change product labeling without prior FDA approval to expedite warnings regarding significant safety information.

www.    However, a handwritten note demonstrates that Dr. Deitch, AHP's Vice President of Medical Affairs convened a meeting to discuss the "implications" of the proposed Pondimin labeling change on dexfenfluramine which was still under the cloud of FDA's February 17, 1995 "non-approvable" letter -- before proceeding.

xxx.    This proposed labeling change regarding a life-threatening cardiovascular disease which was important enough to some members of the AHPⓂs medical department that they recommended it be implemented immediately without prior FDA approval did not get made after Deitch called for the meeting to discuss the implications of the

Pondimin labeling change on dexfenfluramine.

yyy.     Numerous members of the Medical Affairs department have testified that the PPH labeling change should have been made but none have given any explanation as to why it was not.

zzz.     The circumstances, however, lead to the logical conclusion that AHP DEFENDANTS did not change the Pondimin labeling regarding PPH because to do so would have threatened its diet drug business.

aaaa.    In the Summer of 1995, while AHP was considering the label change, it was in the midst of a banner year for Pondimin with sales in excess of $48 Million, more than six times higher than 1994

bbbb.    Sales for the following year, 1996, were estimated to exceed $150 Million.

cccc.    While its diet drug business was booming, the Sales Representative Defendants were in an all out promotional campaign to influence prescribing doctors to prescribe Redux and/or Pondimin.

dddd.    The Sales Representative Defendants received bonuses based on the amount of Redux and/or Pondimin prescribed by the doctors and/or sold by the pharmacies.

eeee.    The Sales Representative Defendants implemented AHP programs which were known by such names, for example, as "Sell the Whales," "Sell the Whales Revised," "Redux Community Education Program," and the "Hospital VIPP/CME Program."

ffff.    AHP also spent approximately $3 million dollars on "mall tour" programs to promote the use of Pondimin and/or Redux.

gggg.    All of these programs contained false and misleading information and/or material omissions about the true risks of PPH, valvular heart disease, and the supposed benefits of Redux and/or Pondimin

hhhh     The text of one AHP document to be used by the Sales Representative Defendants, for use in conversation with prescribing physicians, falsely states: "Doctor, I understand your concerns about the safety of Redux but let me reassure you, Redux is a safe and effective product."

iiii.    The Sales Representative Defendants, as part of AHP's sales force, were also charged by AHP with developing ▯doctor advocates▯ and ▯go to advocates▯ who would then

assist AHP in promoting Redux and/or Pondimin to other potential prescribing doctors.

jjjj.   Unfortunately, these so-called advocates were fed false and misleading information and/or material omissions about the true risks of PPH, valvular heart disease, and the supposed benefits of Redux and/or Pondimin.

kkkk   AHP DEFENDANTS also instructed the Sales Representative Defendants to coordinate their sales efforts regarding Redux and/or Pondimin with sales representatives from other companies to ensure that the "Right message . always the message" was conveyed to the prescribing physicians.

llll.   Unfortunately, the "right message" did not contain the truth about the true risks of PPH and valvular heart disease.

mmmm   Earlier in 1995 the company's market research revealed that consumers were unwilling to accept any risk to take prescription diet drugs

nnnn   Moreover, its market research for Redux also revealed that doctors were overlooking the PPH warning in the Pondimin label and that the "best case" for the company's sales was if consumers were unaware of the risk of PPH and physicians chose not to enlighten them.  If AHP had in fact changed the Pondimin labeling and did so by means of the Special Supplement - Changes Being Effected procedure as had been planned, physicians surely would have questioned why the change was being made

oooo.   If the word got out that AHP DEFENDANTS knew about ten times the number of PPH cases than was described in the present Pondimin labeling, sales of the drug would no doubt have been devastated.  Just as important, if not more so, Dr. Deitch's handwritten note about the need to discuss the implications of the Pondimin label change on dexfenfluramine demonstrates that AHP DEFENDANTS believed that if it changed the Pondimin label the FDA would be even more concerned about approving Redux.

pppp.   Thus, AHP's failure to change the PPH warning and its failure to issue any warning about VHD is entirely consistent with Dr Deitch's remarkable statement to a European representative of AHP that "I have been successful in the U.S , by questioning everything we do on an ROI [Return On Investment] basis, that is, if it

does not add value, it doesn't get done." Clearly, changing the Pondimin label regarding two life-threatening cardiovascular diseases in 1995 would not have contributed to AHP's return on investment.

qqqq.   Instead of sounding the alarm about the rise in PPH cases with Pondimin and the reports of VHD, AHP DEFENDANTS decided to say nothing of those problems to physicians, patients or the FDA.

rrrr.   Instead, AHP DEFENDANTS and IPI started up lobbying and public relations efforts to pave the way for approval of the Redux NDA and for de-scheduling of both Pondimin and Redux from the Controlled Substances List at FDA Advisory Committee meetings to be held in September of 1995.

ssss.   On July 19, 1995, Dr. Bobby Sandage, the Senior Vice-President of IPI wrote to Servier stating that he agreed that "significant PR/lobbying is needed" and discussed getting "numerous parties involved immediately . . . for high level contacts at the FDA and Congress".

tttt.   Among other things, General Alexander Haig, who was a member of the board of IPI was asked to come to the de-scheduling hearing because IPI believed that "the FDAers won't get so "off track" if they realize they are being observed by a high ranking official".

uuuu   Also, the President of IPI, Glenn Cooper, recruited a friend to request that Speaker of the House Newt Gingrich contact FDA regarding its review of the Redux NDA.

vvvv.   On September 28, 1995, the FDA Advisory Committee met to review the Redux NDA.

wwww.   Drs. Stuart Rich and Lucien Abenhaim appeared at the meeting to present data and information about PPH and the IPPHS study. Drs. Mark Molliver and Lewis Seiden appeared to discuss their concerns about animal studies which indicated that fenfluramine and dexfenfluramine were toxic to the serotonergic nerves in the brain

xxxx.   After these presentations, the FDA Advisory Committee voted and found that adequate safety of Redux had not been demonstrated. This vote was devastating to the Redux NDA. However, Dr. James Bilstad, a senior FDA official ⎕rescued the

cause☐ by proposing an additional question to the Committee after several members had left which necessitated a second meeting.

yyyy.  The scheduling, attendance and voting of the second FDA Advisory Committee on November 16, 1995 which resulted in a narrow 6-5 vote for approval of Redux was highly controversial for several reasons.

zzzz.  The second meeting was scheduled for a day when a very important meeting of the Society for Neuroscience was held which meant that neuroscientists who were opposed to the approval of Redux were prevented from attending the second meeting while the drug sponsors' experts were present.

47.

Also, as noted by Dr. Gloria Troendle, an FDA medical officer, at the second meeting: "[M]embers who had been absent the first time as well as members who were present the first time, but absent the second time, and members who had left the first meeting were all allowed to vote. A Committee member absent at this second meeting was allowed to vote, because he had experienced the presentation at the first meeting, but the 3 members who had been absent at the first meeting were also allowed to vote in spite of not having seen the first presentation. What they missed was the testimony of experts FDA had invited to the first meeting. What they heard was the defense of the drug sponsor that the animal studies meant nothing."

Dr. Troendle described these events in a January 5, 1996 memo as "unfortunate irregularities" which focused on the issue of neurotoxicity and whether the FDA Advisory Committee had received sufficient information about it before voting on the Redux NDA

However, critical information regarding PPH and VHD was also withheld from the FDA Advisory Committee

The record is clear that if this information had been disclosed by AHP DEFENDANTS, the Redux NDA would not have been approved and at least one member of the Committee would have recommended that action be taken against Pondimin as well.

With respect to PPH, several critical pieces of information were withheld from the FDA Advisory Committee, the plaintiff, and plaintiff☐s physicians.

First was the fact that the number of PPH cases reported for Pondimin users was

substantially higher than the four cases that were mentioned in the labeling.

Dr. Leo Lutwak, one of the FDA Medical Officers principally responsible not only for reviewing the Redux NDA but also for monitoring the safety of Pondimin, noted at the September 28, 1995 FDA Advisory Committee hearing that FDA was aware of 100 reports of PPH with the use of Redux but was aware of only 7 such reports with Pondimin. Because of his apparent significant disparity, Dr. Lutwak even went on to speculate that the large difference between the number of reports of PPH for Pondimin as compared to Redux raised the question of whether something in Pondimin was actually protective against side effects.

Several representatives of AHP DEFENDANTS were present in the audience at the time Dr. Lutwak made these comments, including Dr. Marc Deitch, Vice-President of Medical Affairs, but no one stepped forward to correct this misimpression and inform Dr. Lutwak that AHP was actually aware of more than 50 reports of PPH with Pondimin rather than merely seven cases. Moreover, no one from AHP informed the FDA that the company had been considering changing the Pondimin labeling for over a year and a half but had held off because of the implications of doing so on the Redux NDA.

On October 2, 1995, Dr. Stuart Rich, one of the world's leading experts on PPH who had been a presenter at the first FDA Advisory Committee meeting, wrote to Dr. Henry Bone, the chairman of the Advisory Committee and copied Dr. James Bilstad on the letter Dr. Rich stated in his letter that: "With respect to the question of evidence of safety sufficient to warrant approval for long-term use, it was clear to everyone that this data was lacking With respect to pulmonary hypertension, the safety issue was trivialized by the FDA review as well as the sponsor. Let me remind you that the IPPHS case control study unequivocally identified a risk of developing pulmonary hypertension which was particularly highest in patients who were obese, using the drug for greater than three months. Translating into whole numbers of a risk of one in 10,000 users, this would result in 100 cases per million patients per year."

Dr. Rich requested that his letter be passed on to the other members of the FDA Advisory Committee and stated he would be willing to appear in person at the second meeting in November to discuss any of his views.

However, Dr. Rich was not invited to attend the second meeting and his letter was not passed on to all of the other members of the Advisory Committee.

Dr. Roger Illingworth, one of the members of the FDA Advisory Committee has testified: that he did not see the letter from Dr. Rich; that he was not informed of Dr. Rich's view that the issue of PPH had been trivialized; and that he was not aware that Dr. Rich, one of the authors of the IPPHS study, believed that the risk of PPH could be as high as one in 10,000.

Dr. Illingworth also testified that had he been informed of that magnitude of risk he would not have voted to approve the Redux NDA.

Obviously, since the vote at the second meeting was only 6-5 in favor of approval, a change in only Dr. Illingworths vote would have yielded a completely different result.

Dr. Illingworths testimony also establishes that AHP DEFENDANTS withheld critical information from the FDA Advisory Committee, the plaintiff, and the plaintiffs physicians, about the risk of VHD as demonstrated by both an animal study and by the adverse reaction reports which came into the company in 1994-1995.

On March 19, 1992, Servier completed the preparation of a report on a long-term carcinogenicity study in Fischer rats. Among other things, the study found an increased incidence of fibrosis in the hearts of the rats.

Internal company documents demonstrate that at least three scientists employed by AHP DEFENDANTS reviewed this report by September of 1995.

Recently, a renowned cardiac pathologist, Dr. Colin Bloor, traveled to France to review the tissue slides from that study. He concluded that the tissue slides demonstrate cardiac pathology very similar to that found in humans who suffered valvular heart disease as a result of their use of diet drugs.

Furthermore, Dr. Bloor noted that these findings should have been further investigated before AHP DEFENDANTS allowed the drug to be consumed by humans. Dr. Illingworth has testified that this animal data was not provided to the Advisory Committee and that it should have been provided because "If a drug has some effect in animals then this should serve as a warning it is going to have some similar effect in humans."

In addition, Dr. Illingworth testified that it was unethical of AHP DEFENDANTS not to provide information to the Advisory Committee about the reports of VHD in humans taking Pondimin that AHP DEFENDANTS had received in 1994 and earlier in 1995.

Dr. Illingworth testified that: if the reports of VHD had been made available to him, he would have voted not to approve the Redux NDA; he would have advised the FDA that further studies should have been initiated immediately regarding this finding; the Pondimin labeling should have been revised to warn physicians of this adverse reaction; and that consideration should have been given to removing Pondimin from the market in 1995.

Despite the fact that the FDA Advisory Committee did vote at the second meeting to approve Redux, albeit without the benefit of the safety information noted above, FDA was concerned enough about safety issues that it wanted the Redux labeling to have a black box warning about PPH.

Interneuron, the formal sponsor of Redux, was not opposed to having such a warning and would have gone along with that request.

However, AHP DEFENDANTS, knowing that its market research demonstrated that such a warning would destroy sales, adamantly resisted the black box warning requested by FDA and any other restrictions on the use of Redux.

In a November 22, 1995, Joseph Bathish, head of Regulatory Affairs, wrote to Fred Hassan, then Executive Vice President or AHP stating· "While we have a very difficult and arduous task of negotiating labeling and Phase IV commitments with the Agency over the next few weeks, every attempt will be made to ensure that no "Black Box" warnings, restrictions of use or negative statements find their way into the Redux labeling   I am sure that there are elements within the FDA who would like to make a variety of restrictions for the use of Redux.  We will make every effort to neutralize such initiatives."

AHP Defendant's efforts to neutralize the FDA's request for a black box warning was successful and in a jubilant February 27, 1996 e-mail to the "SWAT Team", JoAlene Dolan, one of AHP's medical monitors for Redux crowed: "The meeting with FDA yesterday was a tremendous success!  No black box!"

In March of 1996, about a month before Redux received final formal FDA approval, AHP was aware that several leading researchers in the field of PPH, Drs. Rich, Rubin and Abenhaim, were concerned that the approval of Redux would trigger an epidemic of PPH in the United States and wanted AHP and Servier to fund research to study the situation.

In a March 21, 1996 letter to Dr. Marc Deitch, head of AHP's Medical Affairs

Department, and which was copied to Robert Essner, then President of Wyeth, Servier's Dr. Derome-Tremblay wrote: "It would be a good idea for you and Dr. Faich to prepare, and submit to us, several plans of action that could neutralize these gentlemen, without appearing aggressive towards them. I spoke to Mr. Essner about this when I was in Philadelphia."

Despite this warning from three of the top scientists in the field of PPH that the introduction of Redux could cause an epidemic of PPH in the U.S., AHP did not relent in its opposition to a black box warning, apparently never informed the FDA of this dire prediction and did not fund the study requested by the researchers.

Several months later, after Dr. Rich appeared on the Today television show and stated that there were serious safety concerns with Redux, Dr. Deitch called Dr. Rich and told him "to be very careful about things that [he] said from this point on because very bad things could happen".

Dr. Rich took that threat very seriously and he never again spoke to the media about his concerns regarding the safety of Redux.

In April of 1996, the same month that Redux was approved, AHP had further notice that VHD disease could be a problem with Redux and Pondimin.

Dr. Taylor Thompson had earlier been retained by IPI to evaluate PPH cases and in a report dated April 9, 1996 stated that a review of 32 cases of pulmonary hypertension with dexfenfluramine use revealed that 16 of the cases actually had secondary pulmonary hypertension -- i.e., pulmonary hypertension secondary to, or caused by something else -- with left heart failure, valvular heart disease and congenital heart disease being the major causes of the secondary pulmonary hypertension.

Since congenital heart disease could have no relation to the drug use in an adult user of Redux, this meant that valvular heart disease and left heart failure (which can itself be a result of valvular heart disease) were the major causes of the secondary pulmonary hypertension cases reviewed by Dr. Thompson.

Dr. Lutwak at FDA reviewed this report by Dr. Thompson and noted that it "... raises the further issue that dexfenfluramine may potentiate causes for secondary pulmonary hypertension."

AHP was clearly aware of the rather obvious safety issue raised by Dr. Lutwak.

However, AHP did absolutely nothing to evaluate whether or not dexfenfluramine or fenfluramine could potentiate or cause valvular heart disease as suggested by Dr. Lutwak's analysis.

After Redux was approved in April of 1996, the final IPPHS study results were published and showed that patients who took anorexigenic drugs like Pondimin and Redux had an increased risk of developing PPH that was at least 23 - 46 times higher than people who did not take those drugs.

After that information became available, FDA repeatedly broached the subject of the Redux labeling being revised to incorporate a black box warning.

But AHP DEFENDANTS consistently opposed the suggestion that either Redux or Pondimin contain a black box warning until only several weeks before the drugs were taken off the market, at which time AHP DEFENDANTS finally agreed to have a black box warning for both VHD and PPH in the labeling of both drugs.

In the summer of 1996, AHP DEFENDANTS finally initiated a change in the Pondimin labeling for PPH that it had known was inadequate since at least June of 1994 when Dr. Wilson suggested changing it. However, rather than immediately changing the labeling and submitting it to FDA as a "Special Supplement - Changes Being Effected" which had been recommended the previous year, AHP sent the labeling change through the ordinary FDA channels and it was not put into final form and distributed until January of 1997.

In addition to employing this stalling tactic, AHP made matters worse by having its paid consultants write an editorial minimizing the risk of PPH with diet drugs which was published in the New England Journal of Medicine without the authors disclosing that they were paid consultants for the company.

In addition, AHP DEFENDANTS sent out a misleading press release regarding the IPPHS study, which also tended to downplay the risk of PPH.

The lead author of the IPPHS, Dr. Lucien Abenhaim, wrote to Dr Marc Deitch and informed him that the company's press release contained inaccuracies

Dr. Deitch passed this letter on to numerous executives at both AHP, IPI and Servier, but did nothing to correct the misleading inaccuracies in the press release; the most cogent of which was that the risk of PPH could be as high as one in 10,000 diet drug users  It    is

-31-

apparent that the reason why AHP DEFENDANTS never changed the labeling to use this figure regarding the incidence of PPH with diet drug use was because it knew that physicians would be shocked at such a high rate of an invariably deadly disease.

This fact is demonstrated by a November 21, 1995 memo from Carrie Smith Cox, the head of Redux marketing, to Robert Essner and Joseph Mahady, the President of Wyeth-Ayerst Laboratories and the Vice-President of Marketing respectively.

In that memo, Smith Cox stated: "If . . . Redux has a black box for PPH or we must use the incidence I heard [an FDA statistician] quote, 1 in 45,000 once the drug is in broad use, this would likely be an extremely strong negative. As you know, this is probably the biggest single factor remaining to determine future sales performance of the product."

Obviously, if the head of Redux marketing believed that the use of an incidence figure of 1 in 45,000 was going to be "an extremely strong negative", then had AHP DEFENDANTS changed the labeling to inform doctors that the incidence of PPH could be as high as 1 in 10,000 the result would have been even more devastating to sales

On October 3, 1996, well after publication of the IPPHS study in the New England Journal of Medicine demonstrated the greatly increased risk of PPH with anorexigenic drug use, a representative of AHP's Medical Affairs department e-mailed a colleague " . . . can I look forward to my waning years signing checks for fat people who are a little afraid of some silly lung problem?"

Moreover, the evidence demonstrates that apart from belatedly changing the Pondimin labeling regarding PPH two and a half years after its own medical monitor recommended it, AHP DEFENDANTS made virtually no attempt to update the Pondimin warnings in any other respect.

This is demonstrated by several documents authored by Dr. Kelly Davis who took over as one of the medical monitors for Pondimin in early 1997 and the deposition testimony of her predecessor, Dr. Wilson. On April 9, 1997, Dr. Davis wrote to Patti Acri, the head of the group responsible for making changes to the Pondimin label and stated: "Under Adverse Reactions, I am concerned that the list seems to be very brief -- certainly much less extensive than the Redux label. Has this section been updated as safety (spontaneous ADE) data has come in over the years? At the very least, it should include CHF [congestive heart failure],

cardiac valvular disease, but I'm sure there are others."

Dr. Wilson, the prior medical monitor for Pondimin, admitted that the adverse reaction section of the labeling had not been updated as new safety information came in.

About two weeks after her e-mail to Patti Acri, Dr. Davis and Amy Wilson wrote another memo to Acri which listed over 90 adverse reactions which needed to be added to the Pondimin labeling.

Despite the fact that there were numerous deadly diseases included in the list, AHP DEFENDANTS made no further attempt to carry out the suggested changes until shortly before Pondimin was taken off the market.

In March of 1997 Dr. Heidi Connolly, a physician at the Mayo Clinic, contacted AHP to tell it that she had discovered VHD in a number of patients who had been using Fen-Phen. She also told the company that she was preparing a paper for submission to the New England Journal of Medicine to report her findings.

Following its meeting with Dr. Connolly, AHP did everything in its power to obscure the true scope of the problem from the Mayo Clinic, Interneuron, FDA and the public as long as it could.

In March of 1997, shortly after being contacted by the Mayo Clinic, AHP sent Dr. Ginger Constantine and Dr. Philip DeVane from its Medical Affairs Department to the Mayo Clinic to meet with Dr. Connolly.

Despite the fact that the company had received at least 30 reports of VHD in Pondimin and Redux users before that time, the AHP representatives told Dr. Connolly that there had been no prior reports of VHD with either Pondimin or Redux.

The AHP representatives also told Dr. Connolly that the company was planning on doing some animal studies on this issue in the future but they did not inform her of the Servier Rat Study done years before which had already found fibrosis in the heart.

Thus, rather than coming clean about the knowledge in its possession for about two years, AHP continued to withhold that information and feigned total surprise at Dr. Connolly's findings of VHD in Fen-Phen users.

AHP's intent to conceal Dr. Connolly's reports as long as possible is demonstrated by the conduct of its Safety Surveillance department, the office within AHP responsible for

preparing adverse reaction reports and sending them to FDA.

When the Mayo Clinic reports first came to AHP in March of 1997, Amy Myers, the Safety Surveillance Specialist for Pondimin, entered them into the computer database. However, after Dr. Axel Olsen, the head of AHP's Safety Surveillance Department questioned whether they should be in the database, she deleted the reports from the system.

At some later point, those reports were added back into the Safety Surveillance database and AHP claims that it sent the reports to FDA in a timely fashion.

However, Dr. Lutwak, the FDA Medical Officer most closely involved with monitoring the safety of both Pondimin and Redux, wrote in a September 12, 1997 e-mail that his records revealed that he was not informed of any reports of VHD from AHP before July 1997 -- i.e., after the Mayo Clinic publicly announced its findings.

Worried about a leak of information to the general public and prescribing physicians, AHP DEFENDANTS tried to keep IPI in the dark about the Mayo Clinic findings even though the two companies had been holding regular joint Pondimin/Redux safety overview meetings to review and discuss adverse reaction reports since the summer of 1996.

They held those joint meetings because the companies recognized that the two drugs were so closely related that adverse reactions to one drug would likely be seen with use of the other.

On April 8, 1997, at a regular meeting of the Pondimin/Safety Overview Committee which included representatives of both AHP and IPI, Robert Levine, a member of AHP[]s Safety Surveillance Department, began to discuss the reports of VHD from the Mayo Clinic but was quickly interrupted by Dr. Ginger Constantine and told that it was not appropriate to discuss the issue in that meeting.

The following day, Dr. Sandage called Dr. Deitch to ask about the vague information that had been partially disclosed at the meeting before Dr. Constantine silenced Levine and was told by Deitch that it only involved Fen-Phen and that IPI need not be concerned.

However, Deitch's statement was in fact false in that at least one of the reported cases involved the use of Redux

Dr. Sandage later wrote a memo regarding another conversation which he had with a consultant, Dr. Gerald Faich which clearly demonstrates AHP Defendant's attempt to conceal

information about the VHD problem from even its own business partner for as long as possible. In that memo, Sandage wrote: "Dr. Faich called to discuss the Mayo Clinic findings. I told him that we were surprised and that we had almost no knowledge of what was going on. He told me confidentially that he had asked Dr. Dietch when he (Dietch) was going to tell IPI this new information. Dr. Dietch replied "in due time" which Gerry seemed to find astonishing."

By June of 1997 the New England Journal of Medicine had reviewed Dr. Connolly's article about the 24 cases of VHD she had observed and decided to publish it as soon as possible.

In addition, New England Journal of Medicine was so concerned about the risk to the public health that it advised Dr. Connolly that she could contact the FDA about this problem and announce her findings publicly in advance of the publication of the article.

On June 27, 1997, Dr. Connolly called Dr. Bilstad at FDA and it was apparent that the agency had no prior knowledge of the problem up until that time.

Indeed, several days later, on July 2, 1997, Dr. Lumpkin, a senior executive at FDA, wrote e-mails to Drs. Leo Lutwak and David Graham noting that FDA had knowledge of only 28 reports of VHD (the 24 reports from Dr. Connolly and 4 other cases that were already in their database which AHP had reported back in 1995).

Among other things, Lumpkin wanted to know whether the companies had given FDA a "heads-up" call about this situation. However, Dr. Lutwak responded that he had not been made aware of any such reports by AHP before July.

AHP DEFENDANTS continued their policy of hiding information about the risk of VHD even up to the day that FDA told the company that it should take Pondimin and Redux off the market.

On Sept. 12, 1997, FDA met with representatives of AHP and Interneuron and presented information from five different medical centers demonstrating an alarming increased incidence of valvular regurgitation in asymptomatic users of Pondimin and Redux.

The FDA then told AHP that it would be "prudent" to take Redux and Pondimin off the market and the company agreed to do so. However, during the course of that meeting AHP said that it "wondered" whether the signal for valvulopathy had been there all along and

why there had been no reports from Europe.

However, AHP's feigned ignorance of long-standing reports of VHD and reports from Europe is belied by a document prepared by AHP for submission to its "Cardiovascular Expert Assessment Panel" which contains adverse reaction reports and charts summarizing those reports which were prepared before the meeting with FDA on September 12, 1997.

That document proves that prior to March of 1997, AHP had received at least 30 reports VHD in Pondimin and Redux users with about half of those reports coming from Europe.

Moreover, weeks before the September 12, 1997 meeting with FDA, Servier sent AHP a copy of a report it prepared which demonstrated that Servier had been aware of 105 reports of VHD in Redux and Pondimin users before Dr. Connolly of the Mayo Clinic contacted AHP in March of 1997.

Thus, AHP was obviously attempting to protect itself when it, in essence, professed to FDA and to the general public that it did not know of earlier reports of VHD or of such reports from Europe.

48.

Through other claims and litigation, defendants have been made aware of the adverse health effects related to and caused by the diet drugs.

49.

Defendants are liable to plaintiffs under the theories of strict liability, strict products liability, failure to adequately warn, negligence, redhibition, fraudulent misrepresentation, and breach of implied and/or express warranties.

50

Defendants failed to take immediate and direct measures to ensure that the end user of the drug was notified or that those who specialize in weight reduction care were notified of potential dangers and/or harmful effects

51.

The diet drugs referred to herein contained a vice or defect which rendered them either absolutely useless or their use so inconvenient and imperfect that it must be supposed that the buyers would not have purchased them had they known of the vice.

52.

The defendants impliedly or expressly represented that the diet drugs they manufactured, distributed and/or sold were safe for use and would not cause the adverse health effects described above. Presence of the unsafe characteristics of the diet drugs is an absolute vice as provided by Louisiana Civil Code articles 2520 et. seq. regarding redhibition rendering defendants liable in redhibition.

53.

Where defendant seller while knowing of the vice as described above failed to declare it to plaintiffs purchaser, defendant seller is liable for all damages including reasonable attorney's fees as provided by Louisiana Civil Code arts. 2525 and 1953 et seq.

54.

Defendants' acts constitute an adulteration and/or misbranding as defined by Louisiana Revised Statute 40:600 et seq. and/or the Louisiana Food, Drug and Cosmetic Act, and constitutes a criminal act and a breach of duty subjecting defendants to civil liability for all damages arising therefrom.

55.

The diet drugs are an unreasonably dangerous product as defined by Louisiana Revised Statute 9:2800.1 et seq. (the Louisiana Products Liability Act) and the defendant manufacturers are liable for all injuries proximately caused thereby.

56.

Defendants have failed to properly and adequately test the combination of fenfluramine and phentermine to determine the potential adverse health effects. Defendants have also failed to adequately test dexfenfluramine to determine its potential adverse health effects.

57.

Defendants have failed to adequately warn consumers of the harmful side effects of the diet drugs.

58.

As a result of the purchase and use of the diet drugs, plaintiffs have sustained injuries and damages, and/or the aggravation and exacerbation of pre-existing medical conditions, due to use of the diet drugs  Plaintiffs have also suffered a justifiable fear that such conditions will worsen in the

future.

59.

Plaintiffs aver that the Defendants entered into a conspiracy and agreed to fail to properly inform consumers of the known health risks associated with these products. Plaintiffs aver that the Defendants entered into this conspiracy, which included those acts previously described concerning various studies which were not disclosed to the consuming public.

60.

By way of example, not limitation, this conspiracy included the following overt acts and agreements to further the conspiracy:

A.      AHP Defendants specifically agreed to co-promote and market fenfluramine and/or dexfenfluramine. In conjunction with this agreement, false and fraudulent information was provided to pharmacists, consumers, and prescribing physicians about the risks and supposed benefits of these drugs. Upon information and belief, and in furtherance if the conspiracy, AHP Defendants supplied false and misleading marketing and promotional material and programs to unsuspecting pharmacists and prescribing physicians.   Upon information and belief, promotional items contained false and misleading information about the safety and efficacy of Pondimin and/or Redux. As a result of the exponential sales of Pondimin and Redux, AHP Defendants reaped millions of dollars in profits and sales of Pondimin and/or Redux within the state of Louisiana. In fact, as part of their overall agreement, AHP Defendants also agreed to provide others with an "incentive rebate" on many of its pharmaceutical products Upon information and belief, these projects provided false and misleading information about Pondimin and/or Redux.

B.      Eon agreed and conspired with various pharmacies and/or AHP Defendants to ensure that the off-label combination use of these drugs could be timely provided to consumers, pharmacists, and prescribing physicians who were deliberately misled as to the safety and efficacy of these drugs. Upon information and belief, and in furtherance of this conspiracy, Eon, AHP Defendants and various pharmacies coordinated shipments of phentermine and fenfluramine to assure maximum sales of the off label fen-phen combination to unsuspecting prescribing physicians and users of these

dangerous diet drugs.

C.   In the fall of 1996, Bernhard Hampl, the Chief Executive Officer of Eon, conspired with other manufacturers and pharmacies to ensure that an adequate supply of phentermine could be delivered to consumers, pharmacists, and prescribing physicians who were deliberately misled as to the safety and efficacy of these drugs, and to the dangers of prescribing phentermine in combination with fenfluramine.   Upon information and belief, and in furtherance of this conspiracy, other manufacturers manufactured phentermine under Eon's Abbreviated New Drug Application (ANDA).

D.   AHP Defendants and the Sales Representative Defendants, agreed and conspired with sales representatives from other companies, including Interneuron and Lederle, to ensure that "the message, the right message" reached consumers, pharmacists, and prescribing physicians who were deliberately misled as to the safety and efficacy of these drugs.  In furtherance of this conspiracy, prescribing physicians, consumers, and pharmacists were fed false and misleading information about fen-phen and Redux through coordinated programs.

On or about July 14, 1997, mass Redux Sales Meetings took place in San Diego, CA in which representatives from across the country agreed to conspire to develop "Doctor Advocates" and "Product Champions" to assist them in spreading false and misleading information about Redux and/or Pondimin.   As a result of these meetings, a "customer oriented marketing message" was used which specifically targeted consumers with false and misleading information about the safety and efficacy of Redux.  By way of example, not limitation, on May 20, 1997, sales representative Mary Tate was praised by her district manager for creating doctor advocates. "Mary did an excellent job in convincing one of her top prescribers to conduct a Redux Consumer Program and increase the usage of the product."  Upon information and belief, Sales Representative Defendants participated in these programs in much the same way.

Sales representatives from the various companies promoting Redux and/or Pondimin also furthered their conspiracy by implementing "Mall Exhibit Tours" and raffles to specifically target consumers and prescribing doctors with false and misleading

information about the safety and efficacy of these drugs. These programs were implemented in Louisiana on or about March 5, 1997. Upon information and belief, Sales Representative Defendants participated in these programs.

Upon information and belief, Sales Representative Defendants specifically discussed the importance of co-promotion of diet drugs and coordination with sales representatives from other companies, and implemented those discussions and agreements by bombarding prescribing physicians with false and misleading information about Redux and/or Pondimin.

E.     AHP conspired and agreed with various phentermine manufacturers to ensure that no restrictions were placed on doctors who prescribed fen-phen. In furtherance of this conspiracy, Abana Labs sent a letter to various diet drug manufacturers, including Medeva Corporation, so that a coordinated response could be presented by the manufacturers of the diet drugs various investigating agencies. Upon information and belief, Eon participated in and furthered such coordinated responses, and participated in the conspiracy to provide false and misleading information. As a result of the false and misleading information, no action was taken to restrict the use of fen-phen, or otherwise warn physicians about the true risks of the fen-phen diet regimen.

61.

As a direct and legal result of the conspiracy of Defendants, the Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or neurological and other physical injuries associated with their use; physical disabilities, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of diagnostic testing, hospitalization, medical and nursing care and treatment, loss of earnings and loss of the ability to earn money in the future, and the possibility of untimely death.

62.

As a result of the ingestion and use of the diet drugs, Plaintiffs have sustained the following damages:

(a) Past and future medical and health care expenses, including, without limitation, the cost of consultations with physicians about the potential risks of the diet drugs and diagnostic

echocardiograms;

(b) Physical Disability and disfigurement;

(c) Past and future emotional distress, including, without limitation, justifiable fear of disease;

(d) Loss of capacity for enjoyment of life;

(e) Physical and mental pain and suffering;

(f) Inconvenience;

(g) Past and future mental anguish;

(h) Physical pain and suffering;

(i) Increased risk of contracting disease;

(j) Potential future nursing care;

(k) Loss of earnings and loss of the ability to earn money in the future;

(l) Shortened life span and untimely death.

63.

## JURY DEMAND

### PLAINTIFFS DEMAND TRIAL BY JURY IN THIS MATTER.

WHEREFORE, plaintiffs pray that defendants be served with a copy of the Petition and be cited to appear and answer same, and that after due proceedings are had, including trial by jury, judgment be rendered in favor of plaintiffs and against defendants severally and in solido in an amount to compensate the plaintiffs for all damages to which they are entitled by law; for legal interest on all damages awarded from date of judicial demand until paid; for the costs of this litigation; and for such

other and further damages and relief as this Court may deem just and proper.

Respectfully submitted,

JOHN D. SILEO , NO. 17797
ALLAN   BERGER   &   ASSOCIATES,
P.L.C.
4173 CANAL STREET
NEW ORLEANS, LA.  70119-5972
(504) 486-9481

ı HEREBY CERTIFY THAT THE ABOVE AND
FOREGOING IS A TRUE AND CORRECT
COPY OF THE ORIGINAL ON FILE AND OF
RECORD IN MY OEFICE
DY. CLERK OF COURT
PARISH OF ST. JOHN THE BAPTIST, LA
DATE 3/17/04

**PLEASE SERVE:**
Dawne Stagg
730 East St. Francis Street
Brusly, West Baton Rouge Parish, Louisiana 70719;

Amy N. Howe
5656 Berkshire Avenue
Baton Rouge, Louisiana 70806.

Arthur J. McGehee, Jr.
1561 Richland Avenue
Baton Rouge, Louisiana 70808.

Candace Cherise Patten
2225 College Drive, #90,
Baton Rouge, Louisiana 70808;
  And at: 11670 Airline Highway, No. D13,
        Baton Rouge, Louisiana 70808.

Robert Thomas
16927 Weyanoke Drive
Zachary, Louisiana 70791

Leo A. Ascani, Jr.
4324 Liberal Street
Metairie, Louisiana 70001

Chantel L. Leininger,
AAA-1 Budget Mini Warehouse
3701 Division Street, #351
Metairie, Louisiana 70001

Emile F. Mercante, Jr.
Budget Mini Warehouse
3701 Division Street
Metairie, Louisiana 70001

K. Todd Masson
504 Helios Avenue
Metairie, Louisiana 70003.

ION LABORATORIES, INC.
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to: Ralph E. Brown, 7431 Pebble Drive, Fort Worth, Texas 76118.

SMITHKLINE BEECHAM CORPORATION,
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to: Mr. Jim Beery, General Counsel, SmithKline Beecham, 1-T Franklin Plaza, 200
North 16th St., Philadelphia, Pennsylvania 19102-1282.

MEDEVA PHARMACEUTICALS, INC. is now known as CELLTECH MEDEVA. CELLTECH MEDEVA f/k/a MEDEVA PHARMACEUTICALS, INC.
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to: Ms. Helen Wiley, Legal Affairs, Celltech Medeva, P.O. Box 1710, Rochest, New York, 14603

FISONS CORPORATION is now known as CELLTECH MEDEVA. CELLTECH MEDEVA f/k/a FISONS CORPORATION
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to: Ms. Helen Wiley, Legal Affairs, Celltech Medeva, P.O. Box 1710, Rochester, New York 14603.

GATE PHARMACEUTICALS, A DIVISION OF TEVA PHARMACEUTICALS, USA
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to: Charles Krippendorf, Vice President, Gate Pharmaceuticals, Division of Teva Pharmaceuticals USA, 151 Domorah Drive, Montgomeryville, Pennsylvania 18960.

RUGBY LABORATORIES, INC.
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to: Watson Laboratories, f/k/a Modern Wholesale Drug Company, Inc. and f/k/a Rugby Laboratories, by and through its corporate counsel, Robert Funsten, Watson Laboratories, 311 Bonny Circle, Corona, California 91720
       Also serve at Rugby Laboratories, Inc., 2725 Northwoods Parkway, Norcross, Georgia

30071

GENEVA PHARMACEUTICALS, INC.
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to:  Mr. Jerry McIntyre, General Counsel, Legal Department, Geneva Pharmaceuticals, Inc., 2655 W. Midway Boulevard, Broomfield, CO 80038.

INTERNEURON PHARMACEUTICALS, INC.
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to:  Mark Butler, Executive Vice President, CAO & General Counsel, One Ledgemont Center, 99 Hayden Avenue, Lexington, Massachusetts 02421.

EON LABS MANUFACTURING, INC.
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to:  Manager, Eon Labs Manufacturing, Inc., 227-15 North Conduit Avenue, Laurelton, New York 11413.

WYETH-AYERST PHARMACEUTICALS, INC. f/k/a Wyeth-Ayerst Laboratories, Inc.,
Through the Louisiana Secretary of State
Baton Rouge, LA
  For forwarding to: American Home Products Corporation, 5 Giralda Farms, Madison, Wisconsin 07940.

WYETH LABORATORIES COMPANY
Through the Louisiana Secretary of State
Baton Rouge, LA
       For forwarding to American Home Products Corporation, 5 Giralda Farms, Madison, Wisconsin 07940.

AMERICAN HOME PRODUCTS CORPORATION,
Through the Louisiana Secretary of State
Baton Rouge, LA
For forwarding to: American Home Products Corporation, 5 Giralda Farms, Madison, Wisconsin
07940.

A. H. ROBINS COMPANY, INC.
Through the Louisiana Secretary of State
Baton Rouge, LA
For forwarding to: American Home Products Corporation, 5 Giralda Farms, Madison, Wisconsin
07940.

Gem Drugs – Reserve
Through their agent for service
Byron J. Millet
190 W. 10th Street
Reserve, LA  70084

SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED